**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| T.E., an individual, | |
| Plaintiff, | Case No. 22-cv-3185 |
| v. | **JUDGE** _____ |
| | Related Cases: No. 19-cv-849 |
| **WYNDHAM HOTEL & RESORTS, INC.,** | No. 21-cv-4933 |
| **RED ROOF INNS, INC., and** | No. 21-cv-4934 |
| **RED ROOF FRANCHISING, LLC.** | No. 21-cv-4935 |
| | No. 21-cv-5022 |
| Defendants. | No. 22-cv-1924 |
| | No. 22-cv-2682 |
| | No. 22-cv-2683 |

**DEMAND FOR JURY TRIAL**

<u>**COMPLAINT**</u>

COMES NOW, the Plaintiff T.E. ("Plaintiff" or "T.E."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

<u>**INTRODUCTION**</u>

1.      Plaintiff T.E. is a survivor of human sex trafficking.

2.      T.E.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.      T.E. met a person that groomed her into trafficking. Ultimately that person—her trafficker—came to control every aspect of her life. The defining factor of the relationship between T.E. and her trafficker, was that each night, T.E.'s trafficker forced her to have sex with men for money.

4. T.E. was trafficked in Defendants[1] Wyndham Hotels & Resorts, Inc. ("Wyndham"), Red Roof Inns, Inc., and Red Roof Franchising, LLC[2] hotels. T.E.'s trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5. At Defendants' hotels, T.E. was forced to engage in sex with many men every day. Every new customer was another instance T.E. was forced to have sex against her will—that is to say, T.E. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6. T.E.'s trafficker forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7. At some point, T.E. was able to escape the grasps of her trafficker and the prison of Defendants' hotel rooms.

8. T.E. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9. T.E. brings this lawsuit in an attempt to hold the Defendants that imprisoned her, accountable for their role in her trafficking.

## OVERVIEW OF TRAFFICKING

10. A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Wyndham, Red Roof Inns, Inc., and Red Roof Franchising, LLC. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.
[2] Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC will be collectively referred to as "Red Roof."

and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from the trafficking occurring on their properties.

12.     Defendants knew and have known for decades that sex trafficking repeatedly occurs under their brand flags.

13.     Rather than taking timely and effective measures to thwart this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented for this explicit and apparent purpose.

14.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[3] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known facilitate sex trafficking through renting rooms where victims are sexually exploited night after night. Hotels and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15.     The hotel industry ignored human trafficking on their premises, thereby enabling human trafficking in the United States to flourish.

16.     Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

---

[3] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

17.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite:  continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture by renting rooms for human trafficking.

18.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of T.E. on their properties.

19.     T.E., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 and Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Each Defendant, knowingly benefitted from participation in a commercial business venture that it knew or should have known to be engaging in sex trafficking acts in violation of 18 U.S.C. § 1591(a).

## **PARTIES**

20.     Plaintiff T.E. is a natural person and a resident and citizen of Columbus, Ohio.

21.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

a.     Due to the sensitive and intimate nature of the issues, Plaintiff T.E. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[4]

---

[4] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the

4

b.    Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[5] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[6] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[7]

c.    Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.    Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[8]

e.    Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply

---

party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[5] Fed. R. Civ. P. 10(a).

[6] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[7] Fed. R. Civ. P. 26(c).

[8] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

22.     **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham is a Delaware corporation with its principal place of business in Parsippany, NJ.

23.     Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

24.     Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

25.     Days Inn by Wyndham is classified as a value brand hotel.

26.     Wyndham owned, supervised, managed, controlled, and/or operated: the Days Inn located at 2100 Brice Rd, Reynoldsburg, OH 43068 ("Reynoldsburg Days Inn").

   a. Days Inn by Wyndham is a Wyndham Hotel & Resorts, Inc. brand property.

   b. Wyndham employees worked throughout the Days Inn by Wyndham. Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at the Days Inn by Wyndham. Wyndham is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including the Reynoldsburg Days Inn by Wyndham where T.E. was trafficked. Wyndham has an actual

and apparent agency relationship with the physical property owner of the Reynoldsburg Days Inn by Wyndham as to establish vicarious liability.

c. Wyndham controlled and dictated the actions and inactions of the Reynoldsburg Days Inn by Wyndham through highly specific and detailed brand standards, policies, and procedures.

d. Wyndham knowingly benefited, or received something of value, from its commercial business ventures at the Reynoldsburg Days Inn by Wyndham through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where T.E. was trafficked, as well as in maintaining a positive public image for the Reynoldsburg Days Inn by Wyndham.

e. Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Reynoldsburg Days Inn by Wyndham, contracting to supply services in Ohio. Wyndham has derived substantial revenue from services rendered in Ohio, and caused injuries to T.E. in Ohio, and profited from a commercial business venture which unlawfully permitted criminals to sell T.E. for commercial sex at the Reynoldsburg Days Inn by Wyndham.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management,

7

direction, control, or transaction of the ordinary business and affairs of Wyndham.

27.  **Defendant Red Roof Inns, Inc ("RRI").** is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through **Defendant Red Roof Franchising, LLC ("RRF").**[9] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

28.  RRI is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

29.  RRI maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

30.  RRF was named one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

31.  RRF maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

---

[9] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

a. The claims in the lawsuit arise, in part, from Red Roof's conspiracy with other defendants related to business and contracts that took place in Ohio as well as other states.

b. Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn located at 2449 Brice Rd. Reynoldsburg, OH 43068 ("Reynoldsburg RRI").

c. RRI by Red Roof is a Red Roof branded property.

d. Red Roof employees work throughout the Reynoldsburg RRI by Red Roof. Red Roof employees work jobs including front desk and housekeeping. Red Roof is the principal with control over nearly every element of operations at the Reynoldsburg RRI by Red Roof. Red Roof is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Reynoldsburg RRI by Red Roof where T.E. was trafficked. Red Roof has an actual and apparent agency relationship with the physical property owner of the Reynoldsburg RRI by Red Roof as to establish vicarious liability.

e. Red Roof controlled and dictated the actions and inactions of the Reynoldsburg RRI by Red Roof through highly specific and detailed brand standards, policies, and procedures.

f. Red Roof knowingly benefited, or received something of value, from its commercial business ventures at the Reynoldsburg RRI through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms

where T.E. was trafficked, as well as in maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers including T.E. and her trafficker.

g. Red Roof is subject to the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Red Roof regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Reynoldsburg RRI by Red Roof., contracting to supply services in Ohio. Red Roof has derived substantial revenue from services rendered in Ohio, has caused injuries to T.E. in Ohio, and profited from a commercial business venture which unlawfully permitted criminals to sell T.E. for commercial sex at the Reynoldsburg RRI by Red Roof.

h. Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

## JURISDICTION AND VENUE

32.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

33.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Plaintiff resides within this District and a significant part of the acts and omissions giving rise to the cause of action occurred in this District.

34. Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:19-cv-849; No. 2:21-cv-4933; No. 2:21-cv-4934; No. 2:21-cv-4935; No. 2:21-cv-5022; No. 2:22-cv-1924; No. 2:22-cv-2682; and No. 2:22-cv-2683 currently pending before Chief Judge Algenon L. Marbley.

## **FACTUAL BACKGROUND**

### INTRODUCTION

35. T.E. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act, 18 U.S.C. § 2255.

36. The TVPRA prohibits Defendants from engaging in any venture they know or should know involves trafficking, and thereby establishes a non-delegable duty of reasonable care to detect and avoid participation in and benefiting from what they know or should know involves a trafficking venture.

37. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[10] Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.

38. Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues for sex trafficking.

39. As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties.

---

[10] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures; failed to conduct audits confirming compliance with policies and procedures.

40.     Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties, the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures, and the number of rooms that Defendants refused to rent or refunded as a result of identifying the venture as one engaged in trafficking. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

41.     With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like T.E. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties. Everyday victims of human trafficking like T.E. are repeatedly exploited within the rooms of Defendants branded properties across the country.

42.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

43.     Defendants are jointly and severally liable for the Plaintiff's damages in this case.

**THE SEX TRAFFICKING OF PLAINTIFF T.E.**

44.     T.E. met her trafficker when she was thirteen (13) years old.

45.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, T.E. was held captive and sold for sex by her trafficker.

46. During the time that she was trafficked, T.E.'s trafficker frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with T.E.

47. Throughout her trafficking, T.E.'s trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage advertising for T.E.'s availability for commercial sex.

48. T.E. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

49. From approximately 2013 to 2016, while under the coercive control of trafficker, T.E.'s was imprisoned in hotel rooms rented by her trafficker and forced her to have sex for money. During that time, T.E. was trafficked in the following hotels:

   a. Days Inn by Wyndham located at 2100 Brice Rd Reynoldsburg, OH 43068;

   b. Red Roof Inn by Red Roof located at 2449 Brice Rd Reynoldsburg, OH 43068.

50. During the time she was trafficked, T.E.'s trafficker constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

51. While at the Defendants' hotels, T.E.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

52. During her captivity at Defendants' hotels, T.E. was raped, continuously abused physically and verbally, psychologically tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

53.     At the above listed hotels, T.E. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of T.E.'s deterioration brought on by the abuse perpetrated by her trafficker, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties.

54.     Every time T.E. interacted with Defendants' staff, it was readily apparent that T.E. was under the control of her trafficker. T.E.'s trafficker, who was significantly older than T.E. checked in to Defendants' hotels using his own name.

55.     The trafficker of T.E. followed a repetitive and routine procedure during stays at the Defendants' hotels to which Defendants' hotels knew or should have known of T.E.'s trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF T.E. AT THE DAYS INN BY WYNDHAM**

56.     Plaintiff T.E. was subjected to sex trafficking at the Wyndham branded, Days Inn by Wyndham hotel located at 2100 Brice Rd Reynoldsburg, OH 43068 from 2013 to 2016.

57.     Plaintiff and her trafficker stayed at this Days Inn by Wyndham, frequently staying for days at a time, encountering the same staff, within this three-year period. Plaintiff's trafficker was very violent with her here, and loud sounds of abuse could often be heard from the room.

58.     On one occasion at the Reynoldsburg Days Inn by Wyndham, after T.E. and her trafficker got into a fight, T.E.'s trafficker dragged her out of the hotel room by the hair, and through the hallway. Then, T.E.'s trafficker pushed her down the stairs.

59.     T.E.'s trafficker forced her – who was both underage and a minor at the time – to drink alcohol to manipulate and control her. T.E. would be permitted to drink at the bar at the Reynoldsburg Days Inn by Wyndham frequently, even though it was obvious that she was not only under the age of 21, but also a minor.

60.     At the Reynoldsburg Days Inn by Wyndham, there was constant foot traffic and loud sounds of abuse coming from the room. At all hours of the day and the night, the staff witnessed "johns" come into the main entrance and to T.E.'s room. On several occasions, the staff witness T.E.'s trafficker being violent with her in public areas of the hotel.

61.     T.E. remembers the police showing up frequently at the Reynoldsburg Days Inn by Wyndham both to monitor the property and in response to calls.

62.     Further, with each stay at the Reynoldsburg Days Inn by Wyndham, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors going in and out of T.E.'s room; Physical abuse in public spaces; Visible signs of prior/private physical abuse; Women wearing clothing inappropriate for the weather; Living out of the hotel room; and Loud noises of abuse or other violence audible to staff and/or other rooms.

63.     Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at this Days Inn by Wyndham.

64.     These red flags were open and obvious to anyone working at this Days Inn by Wyndham and lasted continuously for three years.

**THE SEX TRAFFICKING OF T.E. AT THE RRI BY RED ROOF**

65.     Plaintiff T.E. was subjected to sex trafficking at the Red Roof branded Red Roof Inn located at 2449 Brice Rd Reynoldsburg, OH 43068.

66.     Plaintiff and her trafficker stayed at this Reynoldsburg RRI by Red Roof from approximately 2013 to 2016, rotating frequently staying days at a time, encountering the same staff. Plaintiff's trafficker was very violent with her here, and loud sounds of abuse could often be heard from the room.

67.     During one stay at the Reynoldsburg RRI by Red Roof, T.E.'s trafficker was arrested at this location, and T.E. was rescued by the Franklin County human trafficking task force.

68.     At the Reynoldsburg RRI by Red Roof, there was constant foot traffic and loud sounds of abuse coming from the room. On several occasions, the staff witnessed T.E.'s trafficker being violent with her in public areas of the hotel. The staff also had access to security camera footage from cameras placed throughout the hotel.

69.     Further, with each stay at the Reynoldsburg RRI by Red Roof, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors going in and out of T.E.'s room; Physical abuse in public spaces; Visible signs of prior/private physical abuse; and Living out of the hotel room.

70.     Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at this Red Roof Inn.

71.     These red flags were open and obvious to anyone working at this Red Roof Inn and lasted continuously for three years.

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS**

72.     Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[11] The United Nations,[12] international

---

[11] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[12] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

non-profits,[13] and the U.S. Department of Homeland Security,[14] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

73.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

74.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[15] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[16] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the

---

[13] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[14] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[15] The Blue Heart Campaign, UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

[16] DHS Blue Campaign Five Year Milestone, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

hospitality industry, and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

75.     The Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

76.     The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

77.     The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

78.     A brief examination of just a handful of examples for each Hotel Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**WYNDHAM**

    a.  Regarding a stay in April 2013 at the Days Inn by Wyndham at 2100 Brice Rd, Reynoldsburg, OH  43068, a hotel customer wrote a review saying, "DO NOT STAY! This was the worst hotel stay that I have ever experienced. We had to demand to be moved to a new room because the sheets in the room reserved had been used. The attendant did not want to accommodate us. After finally persuading him, he had to follow us to the

room to make sure that it had clean bedding, which it did. After he left I discovered that most of the towels in the bathroom were stained. My husband and I shared one. We decided to check out the bar that was onsite and I was absolutely disgusted!! There were a total of 4, count them, 4 prostitutes in and out of the bar. One had no clothes on from mid butt down. The other showing her breasts to her newest customer. There pimp was also there. I'm convinced that they have keys to the rooms and this is the reason for the dirty sheets. Do not stay here!"

b. Regarding a stay in July 2018 at the Days Inn by Wyndham at 2100 Brice Rd, Reynoldsburg, OH 43068, a hotel customer wrote a review saying, "Horrible place to stay. Staff at checked dressed in concert tshirt and beanie. Had strange man pound on door at 2am looking for a girl he paid $15 to meet there. When frobt desk was gir help, told they can't help and to call security if we wanted to. DID NOT feel safe there and will never go back or use a Days Inn again."

c. In September of 2021, the city of Columbus ordered this Days Inn location to be shut down this hotel because of the rampant narcotics activity, prostitution, human trafficking, and other crimes.[17]

**RED ROOF**

a. Regarding a June 2017 stay at the Red Roof Inn located at 2449 Brice Rd Reynoldsburg, OH 43068, a hotel customer wrote a review saying, "DO NOT STAY AT THIS HOTEL !!!! BAD BAD SMELLY ROOMS,

---

[17] Jarrod Clay, *Reynoldsburg looks to shut down hotel plagued by crime,* ABC6 (September 2, 2021), available at https://abc6onyourside.com/news/local/reynoldsburg-looks-to-shut-down-hotel-plagued-by-crime-9-2-2021

POSTITUTES COME TO THIS PLACE AT NIGHT !!!rooms are shown on expedia as nice neat rooms !!! wrong, they smell mold in bathroom and prostitutes are there at night !!! drugs being sold in parking lot, my daughter found a hyperderminic needle in the parking lot ! it was scary with all the weird looking people around at night."

b. Regarding a July 2016 stay at the Red Roof Inn located at 2449 Brice Rd Reynoldsburg, OH 43068, a hotel customer wrote a review saying, "I often stay at RedRoof Inns HOWEVER this was by far the WORSE Red Roof I have ever seen. We had reservations and checked inn to a smoke free King. The room smelled so bad my wife almost threw up. I was given a second room that was still putrid. The Parking lot was littered with trash and left over fast food as well as the food bags. I'm not sure, but there appeared to be prostitutes in the parking lot. Needless to say we cancelled and went down the road."

c. Regarding a July 2017 stay at the Red Roof Inn located at 2449 Brice Rd Reynoldsburg, OH 43068, a hotel customer wrote a review saying, "Quick stop in Columbus at this Red roof will be the last. Rooms very dirty, 1st room smelled so bad had to change. 2nd room smelled better but still very dirty. Floors sticky, beds had not been changed for who know how long. People partying in the parking lot all night, very uncomfortable leaving the room, groups of people just starring at you in the parking lot. Ladies working the area, drugs being used in parking lot. Very ghetto.Armed

security guard walking grounds says it all. Very bad, beware!!!" The Guest
Relations Manager replied apologizing.

## DEFENDANTS FACILITATED THE TRAFFICKING OF T.E.

79.     Each Defendant is a signatory of the Code[18] and thereby have promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies.

80.     Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

81.     Defendant Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

82.     Defendants profited from the sex trafficking of Plaintiff T.E. Defendants rented rooms to T.E.'s trafficker when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where T.E. was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of T.E.'s trafficking.

---

[18] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

83.     Defendants benefited from the steady stream of income that T.E.'s trafficker and "johns" bring to their hotel brands. Defendants profited from each and every room that T.E.'s trafficker and customers rented.

84.     Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of human trafficking occurring at the locations where T.E. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

85.     Moreover, Defendants repeatedly collected data on T.E., her trafficker, and the "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of T.E.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop sex trafficking from occurring in their hotels. If Defendants would have taken proper measures, T.E. and other victims like her, would not have been trafficked at their locations.

86.     Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to prevent sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

> a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

22

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

87. As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, T.E. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS**

88. Upon information and belief, it is a standard practice in the hospitality industry,

followed by both Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

89.     Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

90.     Defendants provide their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a substantial extent controlled by Defendants.[19] Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[20]

91.     Upon information and belief, Defendants require its branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

92.     Upon information and belief, per the relevant franchise agreements,[21] Defendants

---

[19] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[20] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.
[21] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

## WYNDHAM

93. Wyndham exercises day-to-day control over the Reynoldsburg Days Inn and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over the Reynoldsburg Days Inn, as either direct subsidiaries or under the terms of its franchise agreements.

94. Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Wyndham's property management system;

    b. Requiring branded locations to keep audit reports and other records;

    c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

    d. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

    e. Requiring the brands to regularly report data regarding customer feedback to Wyndham;

    f. Providing marketing requirements and standardized marketing services for the branded locations;

    g. Regulating all the policies, procedures, and standards of the branded

properties from the front desks to the bathrooms;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Wyndham's request and to refrain from making substantial changes to the branded property without Wyndham's permission;

k. Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

l. Regulating the rates for room rentals; and

m. Insurance coverage requirements.[22]

95.    Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham.[23]

96.    Wyndham controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.[24]

---

[22] *See e.g.* 2014 Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-Franchise-Disclosure-Document-FDD-July-12-2012.pdf
[23] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15 2022).
[24] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, CHOICE, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 15, 2022).

97.     Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Reynoldsburg Days Inn.[25]

98.     Wyndham mandates branded properties source through Wyndham's global distribution system.[26]

99.     In addition, through an integrated corporate marketplace, Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Reynoldsburg Days Inn.[27]

100.    Wyndham regulates property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[28]

101.    Wyndham manages its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[29]

102.    Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food and beverage.[30]

103.    Wyndham controls and provides centralized technology systems for hotel operations at its brand hotels, including systems its brand hotels must use to access shared customer data and reservations information.  Wyndham also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections,

---

[25] *Id.*
[26] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 20, 2022).
[27] *See e.g., id* ("[Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards.")
[28] Id.
[29] *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management in its Full-Service Hotels,* HOTEL TECHNOLOGY NEWS (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels/
[30] *Supra* n 103

systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Reynoldsburg Days Inn.[31]

104. Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.[32] Wyndham is also responsible for setting the core values and culture for all Wyndham employees.[33] In addition, Wyndham sets forth policies for, and provides employee benefits.[34]

105. Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement.[35]

## RED ROOF

106. Red Roof exercises day-to-day control over the Reynoldsburg RRI and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the Reynoldsburg RRIs, as either direct subsidiaries or under the terms of its franchise agreements.

107. Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

---

[31] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021) 4, https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf
[32] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com/ (last visited Jun. 22, 2022)
[33] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture (last visited Jun 22, 2022)
[34] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US (last visited Jun 22, 2022)
[35] *Human Rights Statement*, http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf (last visited Jun. 15, 2022).

a. Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

b. Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

c. Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

d. Providing and controlling customer review and response platforms;

e. Hosting online bookings on Red Roof's domain;

f. Requiring branded hotels to use Red Roof's customer rewards program;

g. Requiring branded hotels to use Red Roof's property management software;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

i. Providing IT support for all property management systems, owned, operated, and required by Red Roof;

j. setting employee wages;

k. sharing profits;

l. standardizing training methods for employees;

m. building and maintaining the facility in a manner specified by the owner;

n. standardized or strict rules of operation;

o. regular inspection of the facility and operation by owner; and

p. fixing prices.[36]

108. Red Roof manages corporate training, policies, and procedures on human

---

[36] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[37]

109.    Red Roof controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Reynoldsburg RRIs.[38] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[39]

110.    Through its national sales team, Red Roof controls the credit processing system and centralized direct billing at its brand hotels, including the Reynoldsburg RRIs.[40]

111.    Red Roof requires its hotels to use a consolidated IT system and database for property management, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.[41]

112.    Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[42] Red Roof's

---

[37] *See e.g., Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training.  On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")
[38] *Id.*
[39] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")
[40] *Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).
[41] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology
[42] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

privacy policy states that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[43]

113.    Red Roof also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Reynoldsburg RRIs.[44]

114.    In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Reynoldsburg RRIs.[45]

115.    Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[46]

116.    Red Roof posts job openings for its branded properties on its central career positing website.[47] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[48]

---

[43] *Id.*
[44] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/
[45] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising. com/operational-support (last visited Jun. 6, 2022).
[46] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).
[47] *See* https://www.redroofjobs.com/
[48] *Id.*

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

117.    Plaintiff incorporates each foregoing allegation.

118.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

119.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating human trafficking through their participation in the harboring of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

120.    Defendants have benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

121.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

### COUNT 2: 18 U.S.C. § 2255(a) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA")
### (AGAINST ALL DEFENDANTS)

122.    Plaintiff incorporates each forgoing allegation.

123.    Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

124.    Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

125.    Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

126.    Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

127.    Defendants knew that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

128.    Defendants knowingly "harbored" and/or "maintained" Plaintiff, pursuant to 18 U.S.C. 1590(a)(1), by providing her and her trafficker rooms in hotels affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

129.    Defendants knowingly benefited, financially or by receiving anything of value, from participation in a venture that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

130.    Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

     a.  Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages,

including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated: August 19, 2022

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /
Jennifer.elkadi@babinlaws.com /
Kristina.aiad-toss@babinlaws.com
